IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

KUCIREK V. KUCIREK

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KRISTOFER T. KUCIREK, APPELLANT,

V.

COURTNEY A. REINERT, FORMERLY KNOWN AS COURTNEY A. GRAYSON,
FORMERLY KNOWN AS COURTNEY A. KUCIREK, APPELLEE.

Filed October 18, 2022.    No. A-21-923.

Appeal from the District Court for Sarpy County: GEORGE A. THOMPSON, Judge. Affirmed.

Kelly T. Shattuck, of Vacanti Shattuck, for appellant.

Adam R. Little, of Nebraska Legal Group, for appellee.

MOORE, RIEDMANN and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Kristofer Kucirek (Kris) appeals from the order of the Sarpy County District Court modifying its original decree and awarding Courtney Kucirek, now Courtney Reinert, sole legal and physical custody of the parties' minor children and calculating and awarding Courtney child support, finding Kris in contempt of a court order, and ordering Kris to pay the attorney fees for the children's attorney and a portion of Courtney's attorney fees. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

Kris and Courtney were married in 2007 and are the parents of two children: Ethan Kucirek, born in 2008, and Mackenzie Kucirek, born in 2011. Kris filed a complaint for dissolution in

- 1 -

January 2016. Although a dissolution decree was entered in April, that decree was later vacated. Two years later, in a February 2018 stipulated dissolution decree, the court awarded the parties joint legal and physical custody of their children with a provision, based upon the parties' agreement, that no child support should be awarded "due to equal time sharing with the minor children, equal division of the children's expenses, and because both parties are[,] or have the capacity to be[,] high wage earners." The decree also provided that "[t]he parties shall share equally in any extracurricular activity expenses the parties agree the children will engage in" and that "any additional expenses that are not referenced herein will be born equally, but only if both parties agree that the expense is reasonably necessary, and in the best interests of the children."

## 2. MODIFICATION

Following a July 2018 incident in which Courtney reported Kris to law enforcement for allegedly kidnapping Ethan after Kris picked up Ethan from a summer camp, Kris filed a complaint for modification of child custody and support requesting sole legal and physical custody of the parties' children subject to specific parenting time awarded to Courtney, for child support, and for attorney fees and costs. He alleged that a material change in circumstances existed, inter alia, because Courtney and her current boyfriend were "mentally, verbally and physically abusive" to the minor children; Courtney was frustrating his relationship with the children; and Courtney falsely reported to police that he had kidnapped Ethan.

In response, Courtney filed a counterclaim for modification requesting sole custody, child support, and an award of attorney fees. Courtney specifically alleged there was a material change in circumstances that warranted a change in custody because, inter alia, Kris used the parenting plan "as a weapon" against her; Kris continued to be "spiteful, vengeful and hurtful" toward her to the children's detriment; Kris was "a hypochondriac" and has "become hypervigilant regarding the children's medical care, routinely overmedicates the children, and does not notify [Courtney] of appointments to permit her to participate"; was "harassing and uncooperative" regarding payment of shared expenses for the children; coached or encouraged Ethan to lie and discussed litigation with Ethan which caused Ethan distress; and has attempted to damage her relationship with the children.

On March 3, 2020, Courtney also filed a motion to show cause why Kris should not be held in contempt for failing to comply with the court's orders relating to, among other things, his refusal to pay a portion of the children's expenses exceeding $1,500. The district court issued an order to show cause governing the allegation that Kris refused to pay a portion of the children's expenses and scheduled a hearing to be held contemporaneously with the modification hearing.

The district court appointed both an attorney and a guardian ad litem (GAL) for the minor children. The parties stipulated to the appointment of a GAL who was ordered to "investigate the facts regarding the best interests of the minor children and report [those] facts to the court." Also pursuant to the parties' agreement, the GAL was released from her duties in December 2019 subject to the condition that the GAL "prepare a written report regarding her investigation of the facts regarding the best interests of the minor children and shall submit the same to all attorneys involved. Said report shall be submitted as evidence at trial."

During the modification hearing, which was held over four days from December 2020 to April 2021, numerous witnesses testified including Kris; Courtney; Chris Wicks, the children's therapist; and Dr. Mark Goldstein, a licensed clinical psychologist. Additionally, the GAL's report was received into evidence as agreed upon by the parties.

(a) GAL's Report

In the GAL's report, the GAL noted concerns related to the children's emotional well-being and noted that both parents engaged in behavior that placed the children in the middle of their disagreements. However, the GAL stated that, while Kris continued to try to undermine the children's relationship with Courtney, Courtney had actively been improving her parenting and communication to avoid placing the children at the center of the parties' conflicts. She stated, "I am concerned [Kris] is working to undermine [Courtney's] relationship with the children."

The GAL further noted that, during her first visit with the children, they "began reporting an inexhaustible list of complaints about [Courtney]" the majority of which "were related to rules, structure and behavior expectations in [Courtney's] home" including "efforts to redirect behaviors, set limits in behaviors, push[ing] the children to comply with rules or do chores, and expressions of frustration about [the children's] behaviors." The GAL noted that "[n]one of the things the children reported [Courtney] saying to them seemed out of the realm of something any parent in the same/similar circumstances would say, but both children's context was overblown." The GAL noted that:

> The children seemed to intend to be providing examples of how [Courtney] and her husband "psychologically" abuse them. Many of the things the children were discussing had not been stated before to [the children's attorney]. The children reported they don't have to do chores and don't have [the] same kinds of rules at [Kris's] home.

Further, the GAL stated that it was

> obvious that the children had prepared, or had been helped to prepare, a litany of statements to convince me [that Courtney] was horrid. It was as if they had memorized a script. At one point . . . the children would whisper to each other, then have new things to tell me. I listened, asking questions to clarify what they stated. The children didn't answer my questions or veer off script. . . .
>
> In my career, I have never met with children so "prepared" to talk with me. It seemed they had memorized exactly what they would say. I found their reports and demeanor wildly out of the realm of normal behavior of children in a similar circumstance. When I would ask clarifying questions, the speed of their words and efforts to convince me of the truth of their statements intensified, which served to create questions for me regarding the plausibility of their accusations because they described nothing that was abusive, unsafe or dangerous.

The GAL further explained that, in subsequent visits with the children, they did not repeat any of their issues regarding Courtney that they had expressed during the first visit stating:

Upon my first meeting with the children it was very clear they had memorized complaints about [Courtney] in preparation for my visit. In subsequent visits, I checked and rechecked this information with the children. Given the opportunity, they never repeated and[,] in fact, changed their objections regarding [Courtney] to only things related to their stepfather.

(b) Communication

At trial, the parties generally agreed that they struggle with co-parenting and communicating with each other and claimed that the other parent attempted to involve the children in the ongoing legal dispute.

Courtney testified that Kris attempted to sway the children's feelings towards her and coached Ethan to lie about alleged abuse in Courtney's home. Courtney offered into evidence video recordings and transcripts from conversations during which Ethan told her that Kris "is making me talk to a lawyer to say a bunch of bad things about you and Terry." Ethan stated that he was worried that "if [Kris] makes me say a bunch of bad things about you and if I tell the truth and say all that he will get mad and start yelling at me like 'I paid fifty thousand dollars blah blah blah' and then he probably won't forgive me." During the video, Courtney told Ethan not to worry about it and said he could say whatever Kris was going to make him say and she would not be upset with him because she did not want him to get in trouble with Kris.

In subsequent months following that recorded interview, Ethan reported that Courtney locked him in his room and removed the lights, that he was almost always in trouble, that Courtney and Terry hit him, that he gets really bad spankings where it hurts to sit in school, that he gets smacked in the face a lot, that he had to kneel for 60 minutes, that Courtney takes his Halloween candy, that he did not get Easter eggs at Easter as punishment, and that Courtney allowed Ethan to sleep in the same bed with his uncle, Courtney's brother, which led to an allegation by Ethan that the uncle attempted to have sexual contact with Ethan.

(c) Contacts With Law Enforcement and Child Protective Services

In describing the July 2018 alleged kidnapping incident, Kris testified that the parties had agreed that he would pick Ethan up from camp and drop him off at the parties' usual exchange location. However, he acknowledged that Courtney told him the previous day that she was picking up Ethan from camp. Although text messages showed that Courtney messaged Kris around midnight the night before indicating her intent to pick Ethan up from camp, Kris indicated that he did not see the message and, after being unable to reach Courtney that morning, he picked Ethan up from camp at 9 a.m. and waited for Courtney at the exchange location as originally agreed.

Conversely, Courtney testified that, despite being aware that she planned to pick up Ethan at 11 a.m., Kris intentionally went to the camp two hours earlier to prevent her from picking up Ethan. After Courtney arrived at camp and was informed that Ethan had left with Kris, Courtney contacted law enforcement. The police contacted Kris regarding the alleged kidnapping while he was waiting for Courtney at the exchange location. Kris also described two other incidents when Courtney contacted the police which resulted in the police instructing them to stay off each other's property.

Kris acknowledged that he had contacted Child Protective Services (CPS) or law enforcement at least four times to report concerns over Ethan's reports of abuse in Courtney's home including contacting CPS following a disclosure by Ethan that he was forced to be naked and had everything in his room at Courtney's home removed; contacting the police after seeing bruises on Ethan; contacting the police in December 2018 after Ethan told him that he was being hit, was receiving extreme spankings, was forced to wear a diaper, and was forced to wear a batman outfit to school after Ethan made fun of another student wearing batman underwear; and contacting police after learning that the children had been having contact with an uncle who had sexually abused Ethan. Regarding this final police contact, police informed Kris that, because Ethan had not been left alone with the uncle, there was nothing that could be done. The resulting CPS investigations were deemed unfounded.

(d) Testimony of Children's Therapist

Chris Wicks, the children's therapist, testified that, after the entry of the dissolution decree, Ethan and Mackenzie were adjusting well despite the parents' fighting and inability to get along. Wicks testified that Mackenzie was better adjusted than Ethan and did not show loyalty to one parent over the other and he began treating Mackenzie for "general adjustments to being anxious, dealing with just normal life, behaviors. But mainly just the anxiety of being involved in the conflict between the parties." Although Wicks expressed concern about Mackenzie relating to pressure and being in the middle of the two parents, he stated that Mackenzie was able to deal with the situation better than Ethan. At the time of trial, although Mackenzie's last appointment with Wicks had occurred at the end of May 2020, Wicks recommended that Mackenzie continue therapy.

Wicks testified that he has treated Ethan for generalized anxiety, AD/HD, and past trauma due to sexual abuse. Wicks testified that Ethan reported increased anxiety regarding visits with Courtney, school, and interactions with his peers and that he was uncomfortable being around Courtney and with circumstances surrounding Courtney and Kris. Ethan also disclosed that he had been physically abused and reported that, on a "[c]ouple different occasions . . . [Courtney] would . . . have him remove all of his things from his room, grabbing his arm . . . [and] hitting him." Wicks stated that, following a few of the incidents, he had been contacted by CPS to discuss the allegations. Wicks also reported that Ethan stated that he feels safer at Kris's home, wants to live with Kris, and that he does not want to be at Courtney's home. Further, after Ethan reported being uncomfortable at a baptismal event attended by his uncle, Wicks implemented a safety plan wherein Courtney agreed that Ethan would not be left unsupervised, or be forced to participate in activities, with the uncle that Ethan stated had attempted to touch Ethan's penis. Wicks expressed concern that Ethan is:

> caught in the middle of a conflictual situation where he cares and loves both of his parents, yet he doesn't always communicate that. He also feels really conflicted to be loyal to both of his parents. And that constant tug and pull . . . between the best interests of one parent versus best interests of the other, it's wearing on him. It's causing a toll on him.

Wicks elaborated:

> I feel that Ethan specifically is very conflicted between what loyalties and -- with [Courtney] and with [Kris]. I feel like he, to please [Kris], he needs to say that things are bad with [Courtney]. To please [Courtney], he needs to say things are bad with [Kris]. Regardless of the truth of either of those statements, the fact that he's in the middle, has to make that choice at his age . . . creates anxiety and causes major problems.

As it related to those concerns, Wicks stated that he felt that Ethan was pressured or felt obligated to make a choice between his parents. Wicks stated that there were numerous therapy sessions where Ethan would bring a handwritten script concerning issues at Courtney's home and would not answer questions about his statements in the script until he finished listing off the talking points contained in the script. Wicks stated that he interpreted the written script as a list of things that Kris wanted Ethan to talk about. Wicks stated that, when he asked Ethan direct questions, Ethan would not mention the talking points listed in the scripts. Wicks testified that, in the six to nine months prior to trial, Ethan had not brought a script to the sessions and his conversations with Ethan were more natural and Ethan did not report significant concerns about events or circumstances in Courtney's home. Wicks indicated that he remained concerned that Ethan says what he needs to say in order to get what he wants, however, Ethan has learned better adapting skills and he does not appear to be under as much pressure.

From the time Ethan began therapy to the time of trial, Wicks noticed a change in Ethan's loyalties in that he was becoming more loyal to Kris. Wicks expressed concerns related to parental alienation and that he believed that Ethan feels obligated to say things to make his parents happy. However, he noted that, due to scheduling issues, Ethan's therapy sessions in the year prior to the trial generally occurred during Kris's parenting time, which could have an impact on, or reinforce, a child's loyalties to one parent. He also stated that Ethan appeared to know more about the legal issues going on between his parents than he should which exacerbated Ethan's anxiety. Wicks believed that, although both parents had informed Ethan of court proceedings or showed Ethan the contents of court documents, Kris did so more than Courtney.

Wicks also reported an occasion where Kris logged onto a computer game used by Wicks as a tool to connect with clients, as if Kris was Ethan. Kris initiated a chat and attempted to have a conversation with Wicks about therapy. Wicks initially thought it was Ethan until he later found out it was Kris purporting to be Ethan and attempting to identify issues that "we should talk about." Wicks noted that Ethan's developmental and mental health could be negatively impacted by coaching by his parents.

### (e) Dr. Goldstein

Dr. Goldstein, a licensed psychologist who focuses on child psychology and alienation issues, testified on Courtney's behalf about parental alienation syndrome and how to recognize and treat it. He did not meet with Kris, Courtney, or the children, and did not form an opinion on whether the children in this case were being alienated from Courtney.

Dr. Goldstein testified that between one-half and one-third of the cases assigned to him involve an allegation of parental alienation and he identified factors to look for in determining

whether there is evidence of parental alienation. Those factors included evidence of children idealizing one parent while having a totally negative perception of the other; evidence of a child mimicking statements made by the alienating parent; evidence of a child having an absence of guilt related to their behavior towards the non-alienating parent; a history of numerous CPS complaints; evidence of strong loyalties to the alienating parent; indications of a child's insistence that it was their decision to resist visitation with the non-alienating parent; and indications of children calling their parent by the parent's first name instead of "mom" or "dad."

Dr. Goldstein discussed the range of remedies for parental alienation including less intrusive means such as counseling to deprogram the child, a more moderate stage which involved therapeutic intervention with both parents, and an extreme stage which involved removal of the child from the parental home for deprogramming at a separate location. Dr. Goldstein indicated that the longer alienation continues, the more difficult it becomes to remedy. He further stated that the amount of time children spend with the alienating parent depends on the degree of alienation, but that changes in custody are usually reserved for the worst cases due to the possible impact on the child.

(f) Evidence Related to Contempt

The court's order to show cause was directed towards Courtney's allegation that Kris refused to pay court ordered child- related expenses in excess of $1,500. In furtherance of her claim, Courtney submitted an exhibit outlining expenses from August 2018 to November 2020 which detailed $1,756.42 in expenses that she had paid and submitted to Kris for reimbursement, but that he had refused to pay. This exhibit included the following expenses related to the children:

| Date | Description | Kris's Share of Expense |
|------|-------------|-------------------------|
| 8/13/2018 | Champion Sports Karate | $189.50 |
| 10/17/2018 | Doctor Bill | $146.17 |
| 11/2018 | Counseling | $176.25 |
| 12/5/2018 | Counseling | $ 44.25 |
| 5/10/2019 | Counseling | $341.98 |
| 5/11/2019 | Doctor Bill | $141.45 |
| 7/2019 | Heartland Family Services | $ 30.00 |
| 7/26/2019 | Doctor Bill | $ 40.00 |
| 8/9/2019 | Gymnastics Outfit | $ 28.47 |
| 8/11/2019 | School Supplies | $108.01 |
| 9/19/2019 | Heartland Family Services | $ 68.06 |
| 10/8/2019 | Doctor Bill | $ 15.00 |
| 1/2020 | Doctor Bills | $ 30.00 |
| 4/14/2020 | Doctor Bill | $ 15.00 |
| 8/6/2020 | Dentist Bill | $166.00 |
| 10/2020 | Dance Lessons & Materials | $118.73 |
| 10/21/2020 | Doctor Bill | $ 37.06 |
| 11/1/2020 | Dance Lessons | $ 60.50 |

In response, Kris disputed the amount of expenses claiming that he only owed Courtney between $600 and $700. Regarding the medical expenses, Kris claimed that, because Courtney generally requested the amount of the entire bill before insurance payments had been deducted, he compared Courtney's requested amount for a medical expense to the EOB. He stated that whenever the amount owed on the EOB differed from the amount Courtney claimed was owed, he notified Courtney and paid the amount that was listed on the EOB rather than the larger amount claimed by Courtney. Kris testified that Courtney refused to accept those payments and his checks were returned uncashed. Kris testified that he informed Courtney that he would not pay for expenses related to dance lessons incurred in October and November 2020 because she had signed Mackenzie up for the lessons without seeking his approval as required by the dissolution decree.

### 3. DISTRICT COURT ORDER

In July 2021, the district court entered an order modifying child custody and support and awarding Courtney sole legal and physical custody of the minor children and ordering Kris to pay child support. Specifically, the court found that Kris had engaged in parental alienation, had prioritized his personal conflict with Courtney over the children's best interests, made numerous unfounded reports to CPS and police leading to the minor children being interviewed for extended periods of time, and had attempted "to manipulate medical professionals into including his unfounded accusations in medical records." The court ordered Kris to pay $1,118 in monthly child support based upon each parent's earning capacity. In support of that order, the court attributed $110,000 in annual income to Kris and $124,000 in annual income to Courtney.

The court further found Kris was in contempt of the court's order for not paying certain expenses for the children. Kris was sentenced to 30 days in jail with the ability to purge himself of the contempt if he paid $1,756.42 within 180 days. The district court also ordered Kris to pay $10,382.50 in attorney fees for the children's attorney and $10,000 of Courtney's attorney fees. Kris has timely appealed to this court.

## III. ASSIGNMENTS OF ERROR

Kris's assignments of error, renumbered and restated, are that the district court abused its discretion (1) in awarding Courtney sole legal and physical custody of the parties' minor children based upon its determination that a material change of circumstances existed due to Kris engaging in parental alienation and that a change in custody was in the children's best interests; (2) in determining child support; (3) in finding Kris in willful contempt of the court's order regarding reimbursement of the children's expenses and imposing sanctions; and (4) in ordering Kris to pay the children's attorney fees and $10,000 of Courtney's attorney fees.

## IV. STANDARD OF REVIEW

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed by an appellate court de novo on the record, and will be affirmed absent an abuse of discretion. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021). When evidence is in conflict, the appellate court considers

and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than the other. *Id.*

In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which: (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion. *Vyhlidal v. Vyhlidal*, 311 Neb. 495, 973 N.W.2d 171 (2022).

In an action for modification of a marital dissolution decree, an award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Tilson v. Tilson*, 307 Neb. 275, 948 N.W.2d 768 (2020).

## V. ANALYSIS

### 1. MATERIAL CHANGE IN CIRCUMSTANCES/BEST INTERESTS

We first address Kris's claim that the district court abused its discretion in finding that a material change in circumstances occurred which affected the children's best interests due to Kris engaging in parental alienation.

In *Lindblad v. Lindblad*, 309 Neb. 776, 788-89, 962 N.W.2d 545, 554-55 (2021), the Nebraska Supreme Court stated:

> Ordinarily, custody and parenting time of a minor child will not be modified unless there has been a material change in circumstances showing that the best interests of the child require modification. Modifying a custody or parenting time order requires two steps of proof. First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child. Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests. . . .

> Generally speaking, a material change in circumstances is the occurrence of something which, had it been known to the dissolution court at the time of the initial decree or prior modification, would have persuaded the court to decree differently. We have explained that proof of a material change in circumstances is the "threshold inquiry in a proceeding on a complaint to modify, because issues determined in the prior custody order are deemed preclusive in the absence of proof of new facts and circumstances." The rationale for limiting modifications of custody and parenting time to only those necessitated by a material change in circumstances is to avoid extensive and repetitive litigation and unnecessary, potentially harmful fluctuations in the child's life. Simply put, a custody or parenting time order will not be modified absent proof of new facts and circumstances arising since the order was entered that affect the best interests of the child.

In this case, the district court found that Kris's conduct in intentionally alienating the children from Courtney constituted a material change in circumstances impacting the children's

best interests which warranted a change in custody. In doing so, the district court found in different portions of its order:

> The Court finds a material change in circumstances has occurred, namely the parties have an acrimonious relationship that has been marred by conflict that substantially affects their ability to co-parent. The Court agrees with the GAL that the evidence shows Courtney has worked to improve her parenting and communication with Kris to try and remove the minor children from the center of her conflicts with him. While not perfect, she has shown a marked improvement during the pendency of this case despite Kris's best efforts to the contrary.

> Kris, on the other hand, has consistently sought to undermine Courtney's relationship with the minor children. The Court is especially concerned with Kris's continued willingness to involve the minor children in these proceedings. Evidence showed that Kris, on at least several occasions, provided court documents or parental communications to the minor children to sway their opinion. This is directly contrary to their best interests.

Then, after, summarizing portions of evidence elicited during the course of the trial including, but not limited to, evidence from the GAL, the children's therapist, and Dr. Goldstein, who testified to factors which appear in cases of parental alienation, the district court found:

> The Court finds these factors occur in the case at hand. Specifically, . . . Ethan . . . exhibits these behaviors and attitudes. Ethan's expressed preference is not based on intelligent or mature decision making and the Court gives the same little consideration. It is apparent that his motivations are to avoid consequences for his actions and to live in a home with fewer rules and expectations. When combined with evidence of Ethan's incredibly disruptive behavior, unjustified animosity towards Courtney, unreasonable adoration of Kris, and frequent use of scripts likely prepared by Kris in therapy and in meetings with the GAL, the Court is concerned that Ethan is exhibiting the behavior of an alienated child. That is not consistent with his best interests.

> Furthermore, the Court finds Kris engaged in alienation actions and inactions. Some of Kris's actions were done with purpose, others were done unconsciously. Kris engaged in a direct attempt to undermine the minor children's relationship with Courtney. Kris, on multiple occasions, exercised poor judgment with respect to the minor children, often prioritizing his personal conflict with Courtney over the children's best interests. This includes making numerous unfounded reports to CPS and the police, many of which led to the minor children being interviewed for extended periods of time. There is little doubt this had a negative impact on the children, and their perception of Courtney. The Court is also concerned about the frequency of doctor visits, and Kris's attempts to manipulate medical professionals into including his unfounded accusations in medical records.

We do not read Kris's argument to be that alienation by one parent cannot support a change in custody. To the contrary, in *Lindblad v. Lindblad*, 309 Neb. at 790, 962 N.W.2d at 556 (2021), the Nebraska Supreme Court held that "an increase or escalation in parental instability or parental

behavior that affects the best interests of the child can support a judicial finding that there has been a material change in circumstances, even if there is some evidence of similar behavior in the past." And, in *Hossack v. Hossack*, 176 Neb. 368, 374, 126 N.W.2d 166, 170 (1964), the Nebraska Supreme Court held:

> This court subscribes to the proposition of law set out in Annotation, 32 A. L. R. 2d 1005, as follows: "By the great weight of authority, conduct toward a child which tends to poison the child's mind against, and alienate his affection from, his mother or father, is so inimical to the child's welfare as to be grounds for a denial of custody to, or a change of custody from, the party guilty of such conduct."

Instead, we read Kris's argument to be that there was insufficient evidence in this record to support a finding that alienation by Kris towards Courtney took place here such as to justify a change in custody. More specifically, Kris argues:

> In reviewing the record at trial, however, neither the [GAL], the expert, Dr. Mark Goldstein, the minor's counselor, Chris Wicks, or the minor's attorney made recommendations that were consistent with the trial court's finding and none of the experts identified the solution to the identified primary concern be a change in custody or that change would be in the children's best interest.

Brief for Appellant at 16. We disagree. Kris cites to no cases suggesting that a court cannot modify a prior custody order without expert testimony which establishes a change is warranted and our independent research has uncovered none. To the contrary, "[c]hild custody determinations, and parenting time determinations, are matters initially entrusted to the discretion of a trial court, and although reviewed de novo on the record, the trial court's determination is normally affirmed absent an abuse of discretion." *Wolter v. Fortuna*, 27 Neb. App. 166, 168, 928 N.W.2d 416, 420 (2019).

In this case, Dr. Goldstein established the factors associated with parental alienation of another parent. After reviewing the testimony of the GAL, the child's therapist, and the testimony of the parties, the district court found that Kris, who the court explicitly found not be a credible witness, had used the court ordered parenting plan as a weapon against Courtney; continued to be spiteful, vengeful, and hurtful towards Courtney to the detriment of the parties' children; had coached and encouraged Ethan to lie which caused Ethan distress; had discussed litigation with Ethan which caused Ethan distress; and had attempted to damage Courtney's relationship with the parties' minor children. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than the other. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021).

When providing that weight here, on our de novo review, we find the record sufficient to support the district court's factual conclusion that Kris had engaged in conduct designed to alienate Courtney from her children. And when considered with the Nebraska Supreme Court's statement in *Hossack v. Hossack*, 176 Neb. 368, 374, 126 N.W.2d 166, 170 (1964), that

> [t]his court subscribes to the proposition of law set out in Annotation, 32 A.L.R.2d 1005, as follows: 'By the great weight of authority, conduct toward a child which tends to poison

the child's mind against, and alienate his affection from, his mother or father, is so inimical to the child's welfare as to be grounds for a denial of custody to, or a change of custody from, the party guilty of such conduct[,]'

we find the court did not abuse its discretion in finding that a material change in circumstances occurred here which impacted the children's best interests since the entry of the prior child custody order. This assignment fails.

Kris next contends that the district court abused its discretion in finding that a change in custody was in the children's best interests. He contends that "[t]here was no evidence presented to prove or establish a change in custody is appropriate or in the children's best interest[s}." Brief for appellant at 20.

Recently, in *Burton v. Schlegel*, 29 Neb. App. 393, 417-19, 954 N.W.2d 645, 663-64 (2021), this court stated:

Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides that in determining custody and parenting arrangements:

[T]he court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . .:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Kashyap v. Kashyap*, 26 Neb. App. 511, 921 N.W.2d 835 (2018).

. . . .

Although not a completely determinative factor, the promotion and facilitation of a relationship by one parent with the other parent is a factor that may be considered when awarding custody. See *Kashyap v. Kashyap, supra*. It stands to reason that a parent's intentional refusal to promote and facilitate the other parent's involvement in a child's important educational, religious, and medical needs constitutes a significant factor to consider when making custody decisions.

As we previously discussed, the district court found that Kris had engaged in a systematic campaign to alienate the children from Courtney and we found no abuse of discretion in connection

with that finding. Having determined that this conduct constituted a material change in circumstances that adversely impacted the children, the question becomes whether a change in custody was in the children's best interests in light of this impact. As we already noted, the Nebraska Supreme Court has held that conduct of this nature which tends to poison the child's mind against, and alienate his affection from, his mother or father, is so inimical to the child's welfare as to be grounds for denial of custody to or a change in custody from, the parent guilty of such conduct. See *Hossack v. Hossack*, 176 Neb. 368, 126 N.W.2d 166 (1964). Inherent in that statement is that, under such circumstances, it can be in the best interests of the child to deny or change custody because of the negative impact of that conduct on the child or children. The question here is whether the court abused its discretion in finding that Kris's conduct here warranted a change in custody. We find that the court did not abuse its discretion in so finding.

Although both parents were unable to effectively communicate with each other, the court determined that Courtney improved her conduct while Kris persisted in his. And after reviewing the degree to which Kris attempted to alienate his children from Courtney, a form of conduct which the Nebraska Supreme Court has described as inimical to the child's welfare, we cannot say that the district court abused its discretion in finding that this case presents a scenario in which the court's original joint physical custody award should be modified. Although Kris argued that not even Dr. Goldstein recommended a change in custody, as we noted before, determinations of this type are vested in the sound discretion of the trial court. And, considering Kris's conduct and the effect of that conduct on the children, when considered in connection with the factors set forth in § 43-2923(6), we cannot say that the court abused its discretion in finding that awarding Courtney sole legal and physical custody was in the children's best interests. This assignment fails.

2. CHILD SUPPORT

After modifying custody from joint physical custody to an award of sole legal and physical custody to Courtney, the court then turned to the issue of child support and ordered Kris to pay a monthly child support obligation of $1,118 after attributing $110,000 in annual income to Kris and $124,000 in annual income to Courtney. Kris argues that the district court erred (a) in determining both parties' earning capacities in calculating child support and (b) using worksheet number one which provides for a basic income and child support calculation instead of worksheet number three which provides for a joint custody calculation. We will address these assignments independently.

(a) Parties' Income

Kris first argues that, in calculating child support, the court erred in calculating Courtney's earning capacity, and in imputing income to him that did not match his tax returns.

In general, child support payments should be set according to the Nebraska Child Support Guidelines. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). Neb. Ct. R. § 4-204 (rev. 2020) provides in relevant part:

> (A) Total monthly income is the income of both parties derived from all sources, except all means-tested public assistance benefits which includes any earned income tax credit and payments received for children of prior marriages. This would include income that could be acquired by the parties through reasonable efforts. For instance, a court may

consider as income the retained earnings in a closely-held corporation of which a party is a shareholder if the earnings appear excessive or inappropriate. . . .

. . . .

(E) If applicable, earning capacity may be considered in lieu of a parent's actual, present income. Earning capacity is not limited to wage-earning capacity, but includes moneys available from all sources. When imputing income to a parent, the court shall take into consideration the specific circumstances of the parents, to the extent known. Those factors may include the parent's residence, employment and earnings history, job skills, educational attainment, literacy, age, health, and employment barriers, including criminal record, record of seeking work, prevailing local earning levels, and availability of employment.

Use of earning capacity to calculate child support is useful when it appears that the parent is capable of earning more income than is presently being earned. *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018). However, earning capacity should be used to determine a child support obligation only when there is evidence that the parent can realize that capacity through reasonable efforts. *Id.*

At the time the initial dissolution decree was entered, the court attributed a $110,000 annual earning capacity to Kris and utilized Courtney's actual income of $176,595.96. However, in the modification, the district court utilized both parties' earning capacities in determining child support based upon its finding that "the evidence shows that both parties actually earn or can reasonably expect to earn more income than their present salaries on a regular basis."

Shortly after the dissolution decree was entered, Kris obtained employment earning $120,000 but he was terminated from that position due to unsatisfactory performance after which he eventually obtained employment earning $82,500 per year plus a yearly bonus. The district court calculated Kris's earning capacity at $110,000 finding that "Kris's testimony that his current salary is the very best that he can do without several years of advanced training to be unpersuasive and unsupported by evidence, particularly in light of this Court's prior credibility determination" and that "the most appropriate means to calculate Kris's income for child support purposes is his income capacity which has not changed since the Decree." We also note that, in his testimony, Kris admitted that he believed that he could eventually earn $110,000 again.

Based upon our de novo review of the record, and acknowledging that the district court had the opportunity to see and hear the witnesses' testimony, we conclude that, notwithstanding Kris's salary at the time of the trial, based upon the court's prior determination of Kris's earning capacity, Kris's prior employment history, his testimony at trial, and the court's credibility determinations, the district court did not abuse its discretion in determining that Kris's earning capacity was $110,000 for the purposes of calculating child support.

In evaluating Courtney's earning capacity, Kris takes issue with the district court utilizing a six-year income average approach when Courtney acknowledged that she had voluntarily worked only part-time in the two years prior to trial. However, considering that Courtney was awarded sole legal and physical custody of the minor children, we find that the methodology employed by the court in determining Courtney's earning capacity looking forward was not an abuse of

discretion and the court's calculation of Courtney's earning capacity at $124,000 fell within the range Courtney testified she could earn in the future. In considering these factors and in light of the district court's credibility findings, we find no abuse of discretion governing the court's calculation of the amount of Courtney's earning capacity. This assignment of error fails.

(b) Worksheet One vs. Worksheet Three

Having found that the district court did not abuse its discretion in determining the parties' income capacities, we now consider Kris's claim that the district court erred in using worksheet one, the basic income and child support calculation, instead of worksheet three, which provides for a joint custody calculation.

Neb. Ct. R. § 4-212, which defines when a court should utilize worksheet 3 to calculate child support, provides:

When a specific provision for joint physical custody is ordered and each party's parenting time exceeds 142 days per year, it is a rebuttable presumption that support shall be calculated using worksheet 3. When a specific provision for joint physical custody is ordered and one party's parenting time is 109 to 142 days per year, the use of worksheet 3 to calculate support is at the discretion of the court. If child support is determined under this paragraph, all reasonable and necessary direct expenditures made solely for the child(ren) such as clothing and extracurricular activities shall be allocated between the parents, but shall not exceed the proportion of the obligor's parental contributions (worksheet 1, line 6). For purposes of these guidelines, a "day" shall be generally defined as including an overnight period.

In *Dooling v. Dooling*, 303 Neb. 494, 517, 930 N.W.2d 481, 501 (2019), the Nebraska Supreme Court stated:

Nebraska's Parenting Act defines joint physical custody as "mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time.". . . While "primary possession" is not a statutorily defined term, we have indicated in our opinions that the label that a court uses is not controlling and that the classification of a custody arrangement is ultimately dictated by parenting time.

Here, Kris was ordered to pay $1,118 in monthly child support for the parties' two minor children. The court denied Courtney's request for an upward deviation and noted that the parties would "no longer operate on the reasonable and necessary shared expenses that exists in a joint custody arrangement."

From our de novo review of the court's parenting plan, even assuming that Kris exercises all of his parenting time, he will still fall below the 142-day threshold triggering the rebuttable presumption for the use of worksheet three. We note that, although the brief for appellant concludes that he would have the children for 151 overnights per year, he offers no explanation of how he calculated that number and, in our independent calculation, we determined that Kris's total overnights per year would not exceed 142 days. Where, as here, one party's parenting time is 109

to 142 days per year, the use of worksheet three to calculate support is within the discretion of the court. The district court noted by utilizing worksheet one "that the parties would no longer operate on the reasonable and necessary shared expenses that exists in a joint custody arrangement," which should substantially decrease the parties' past difficulties over the children's expenses. Based upon our review of the record, we cannot say that the district court abused its discretion in declining to use worksheet three. This assignment of error fails.

### 3. CONTEMPT

Kris next contends that the district court abused its discretion in finding that he was in willful contempt of the court's order requiring the parties to pay certain child-related expenses in excess of $1,500. More specifically, he asserts that "[t]he record is unclear what, if anything, would be owed if Courtney had accepted the payments made and there is no evidence that accurately supports the [court's] finding of $1,756.42 owing as that figure would include hundreds of dollars in expenses not in existence at the time of the Show Cause filing" and that there were "several expenses both parties never agreed upon." Brief for appellant at 28.

In *Vyhlidal v. Vyhlidal*, 311 Neb. 495, 509, 973 N.W.2d 171, 182-83 (2022), the Nebraska Supreme Court recently stated:

Civil contempt proceedings are instituted to preserve and enforce the rights of private parties to a suit when a party fails to comply with a court order made for the benefit of the opposing party. A civil sanction is coercive and remedial; the contemnors carry the keys of their jail cells in their own pockets, because the sentence is conditioned upon continued noncompliance and is subject to mitigation through compliance. Moreover, costs, including reasonable attorney fees, can be awarded in a contempt proceeding when there has been a finding of contempt.

"Willful disobedience is an essential element of contempt; 'willful' means the violation was committed intentionally, with knowledge that the act violated the court order. Outside of statutory procedures imposing a different standard or an evidentiary presumption, the complainant must prove all elements of contempt by clear and convincing evidence." *Vyhlidal v. Vyhlidal*, 311 Neb. at 508, 973 N.W.2d at 182.

Here, the district court found that Courtney met her burden that Kris willfully and contemptuously violated the court's order requiring him to pay certain expenses related to the children and determined that the appropriate sanction was 30 days' jail. The court further ordered that Kris could purge himself of this sanction by paying his share of these expenses in the amount of $1,756.42 within 180 days of this order. The court specifically found:

Kris has intentionally muddied the water in an attempt to avoid consequences. While the Decree does require the parties to exchange explanation of benefits documents ("EOBs"), the order specifically requires reimbursement for the amount paid, not what should or could have been paid. Kris specifically testified that he would base his reimbursement payments to Courtney off of the insurance EOBs and not what Courtney actually paid.

This piecemeal approach would result in various payments sent to Courtney that did not line up with her requests for reimbursement. Kris would also add and deduct

- 16 -

expenses based on his own determination of what he should pay, further obfuscating what expenses he has actually and properly reimbursed for. Despite this, Kris did admit that he does owe Courtney "several hundred dollars."

Courtney testified that she did reject a few payments, specifically because they did not line up with the amounts she was requesting and because it would make tracking which expenses were or were not paid more difficult. She repeatedly asked Kris to reimburse for the correct amounts, and he would typically respond with arguments over what was or was not owed, even going so far as telling her she needed to negotiate better with providers and insurance before he would reimburse. Exhibit 135 is a list of outstanding expenses owed by Kris as of November 2, 2020; while the show cause order only covers those expenses incurred through the March 3, 2020, order, this exhibit includes those expenses still owing.

Kris's admission that he still owes Courtney "several hundred dollars" is an admission that he willfully violated this Court's orders, that he knows he owes the money, and that he has either not paid it or has obfuscated payments in such a manner that it is impossible to accurately track. This meets the clear and convincing standard as there is little doubt that he failed to abide by this Court's orders.

The court further rejected Kris's claim that he was under hardship due to his unemployment for a period of time because Kris's unemployment was due to his actions. The court was also "unpersuaded" by Kris's argument that he had no investment income which the court found "dubious given the proficiency in which he operated in this area during and subsequent to the dissolution of the marriage."

In our de novo review of the record, we note that the court's order to show cause was limited to Kris's nonpayment of children's expenses which Courtney indicated was in excess of $1,500 and that Kris admitted that he owed reimbursement of expenses to Courtney. We further note that the court rejected Kris's argument that his refusal to pay Courtney was based upon the uncertainty of the balance and found that Kris was obligated to reimburse Courtney for amounts she actually paid on the children's behalf. Again, when providing appropriate weight to the factual findings here by the district court who heard the evidence and observed the witnesses, we find that the district court did not clearly err in its factual findings, nor did the court abuse its discretion in finding Kris in contempt of the court's order. This assignment of error fails.

### 4. ATTORNEY FEES FOR CHILDREN'S ATTORNEY AND COURTNEY'S ATTORNEY

Kris's final assignment of error is that the district court erred in ordering him to pay the attorney fees for the children's attorney and in ordering him to pay $10,000 of Courtney's attorney fees. We note that Kris does not allege that the attorney fees incurred were unreasonable.

As this court recently stated in *Parde v. Parde*, 31 Neb. App. 263, 286, ___ N.W.2d ___ (2022):

Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014). Customarily, attorney fees are awarded only to prevailing parties or assessed against those who file

- 17 -

frivolous suits. *Id*. In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Id*.

### (a) Attorney Fees for Children's Attorney

Kris argues that district court erred in ordering him to pay the attorney fees for the children's attorney because "both parents behaved in a manner that resulted in conflict and both should be equally responsible for [the children's attorney] fees." Brief for appellant at 30.

Here, the district court ordered Kris to pay the outstanding attorney fees for the children's attorney in the amount of $10,382.50. This amount reflected 69 hours and 13 minutes billed at an hourly rate of $150. The affidavit submitted by the children's attorney stated that the legal services rendered on behalf of the minor children were necessary and that her fees were fair and reasonable based upon her education, training, and experience. In ordering Kris to pay the attorney fees for the children's attorney, the Court noted that it granted the appointment of an attorney for the minor children at Kris's request and "that the same was necessary due to Kris's actions and/or inactions that caused the minor children to exhibit their poor behavior."

We reject Kris's claim that the district court should not have ordered him to pay the children's attorney fees because "both parents behaved in a manner that resulted in conflict and both should be equally responsible" for the attorney fees for the children's attorney. Brief for appellant at 30. The GAL's report indicated that while both parents had engaged in improper conduct, Courtney sought to improve her communication and avoid placing the children in the middle of the parties' conflicts, whereas Kris continued to undermine the children's relationship with Courtney. In its findings, the district court agreed that Kris engaged in alienation of the children from Courtney, modified custody and child support due to the severity of Kris's behavior and the impact on the children, and assessed attorney fees consistent with this result. We find no abuse of discretion associated with this finding.

### (b) Courtney's Attorney Fees

Kris asserts that the district court erred in ordering him to pay $10,000 of Courtney's attorney fees as the prevailing party "because the court did not identify which portion was attributable to the contempt versus the custody modification." Brief for appellant at 30.

Courteney submitted exhibits showing that she incurred $58,978.52 in attorney fees and expenses for her first attorney who she retained through November 6, 2020. The first attorney's affidavit set forth that her rate was $395 per hour, $150 per hour for staff and paralegal time, and that the charges were fair and reasonable based upon the attorney's training, experience, and reputation. Courtney also incurred $30,720 in fees and expenses for her second attorney through the April 2021 billing cycle. The second attorney's affidavit set forth that her rate was $200 per hour, paralegal time billed at $120 per hour, and that the charges were fair and reasonable based upon the second attorney's training and experience.

In ordering Kris to pay $10,000 of Courtney's attorney fees, the district court found that Courtney was the prevailing party in both the modification and her application to show cause and because Kris had engaged in alienating behavior. Specifically, the district court found:

> Kris sought a modification in this case despite knowingly engaging in alienating behavior intended to disrupt the children's relationship with Courtney. The record is replete with examples of Kris intentionally obfuscating issues, over litigating, repeatedly calling CPS and the police, and other improper conduct that unnecessarily expanded these proceedings. The Court further finds that Kris's improper conduct unnecessarily expanded these proceedings, and an award of attorney fees is appropriate, equitable, and just.

The court further noted that in making its determination, it "[had] considered all of the equities of this case, including the previous attorney fees awarded as sanctions, and Kris's child support obligation."

Here, Courtney was the prevailing party in both the contempt action and the custody modification. Kris cites to no case law to support his argument that the district court was specifically required to identify the portion of attorney fees attributable to a particular part of the case. However, we note that "[c]osts, including reasonable attorney fees, can be awarded in a contempt proceeding when there has been a finding of contempt." *Becher v. Becher*, 311 Neb. 1, 29, 970 N.W.2d 472, 493 (2022). Additionally, based upon our de novo review of the record, we find that the evidence supports the district court's determination that Kris unnecessarily expanded the proceedings due to his improper conduct and that he sought a modification after he engaged in parental alienation. Accordingly, we find that the district court did not abuse its discretion in awarding Courtney a portion of her attorney fees as the prevailing party in the matter.

## VI. CONCLUSION

Having considered and rejected Kris's assigned errors, we affirm the order of the district court in its entirety.

AFFIRMED.